Our fourth case for this morning is Kasey Burton v. City of Zion. Mr. Horwitz. Good morning, Your Honors. May I reserve three minutes for rebuttal? Watch your time. When it gets down to three, you can wrap up. Thank you. Okay, The core point of this appeal is that the essential ingredient of our case was removed from the case. The essential ingredient of the case was that our client was in fear and that the officers knew or reasonably should have known that. So you need to help me with a couple of things here because obviously we're dealing with an objective test. I mean the officers see her, recognize her, realize that she's got the suspended license, they activate their lights, she refuses to comply by pulling over, and then we have the takedown where they tackle her instantly when she gets out of the van. But I need to know two things, I to me as clearly as you possibly can what the non-propensity use is of the 2008 incident that you think should have been in. And secondly, how their knowledge that she may have been very apprehensive about police officers should factor in. I can think of entire neighborhoods in Chicago where we are told that most of the people who live there are very apprehensive about the converts into some objective expectation of police behavior. As for the second component, let me take that I agree with you and I'm not arguing that. And if one did argue that it would create a whole bunch of extrapolations that would be problematic for the police department and for everybody. Very difficult for the police department. Depend on person by person and neighborhood by neighborhood. Agreed. Okay. I'm not arguing that. All right. What I am arguing relative to that is that what is absolutely peculiar about this case and what you probably haven't seen before in any other case that we couldn't find is that you had the same defendant, same municipality and this plaintiff were five years prior in a traffic scenario. Our case was a traffic scenario before the court. The prior incident was a traffic scenario. This officer tasered her and use excessive force when ticketing her. Got out of the car, tasered her. She was handcuffed and the municipality found same municipality, Zion. They said excessive force. So two officers stated and the court wrote in her opinion in summary judgment. Okay. Long before the trial, she said there are two officers here who have explained that it's reasonable for those two officers to take into consideration this prior instance where excessive force was used by a Zion cop. What if, what if those two officers had been on vacation during the entire time period when this second incident happens? Now they go on, is it March 13th, 2014? So they're on vacation for the entire month of March. So she's driving along. Somebody else recognizes her, another police officer in Zion. There must be more than two of them. Um, and everything else happens. She doesn't necessarily know that officer, I don't know how he pronounced his name, Rickert or Richard. Yes, Richard. Richard. Um, she doesn't know that. Uh, so these completely different police officers, um, follow her home, jump on her, throw her down to the ground and so on. Same case? No. So it really depends in your view on the personal knowledge of officer Richard and his involvement. It is an important component. What I said to you before, it's not our case. Because officer Richard exquisitely knows the facts of this case. He knows that he abused this lady previously and that his boss, his department, said so through an internal investigation. But how does that make her refusing to pull over objectively reasonable? The issue isn't, the Graham versus O'Connor test is not whether or not she pulls over as objectively reasonable. That's not the objective reasonable test. The objective reasonable test is what a reasonable officer would know under the circumstances with the knowledge of that officer. That's the test. So would it make any difference whatsoever to your argument if it's Richard or Myers or Arrington who is making the stop? Well Richard did make the stop. Richard was. Well I mean he was there but. No, he Here's what I think. I think that the other scenarios and the like the permutations and how the argument would flow with other scenarios is relevant. But there's an exquisite and peculiar set of facts with this case that, and you're asking me about all the cases, those are the cases you've had before you ad infinitum and you'll continue to have them. Where there's another in Chicago, a CR, or a sustained internal investigation and the question is does it come in and what's the reason for it coming in? And whether or not the plaintiff knows about it and things like that. But this case, what's inextricably interlinked with these facts. It's this officer and this plaintiff. What I want to do, if I could, is give you the six reasons why. You can, but you still have to. I'm worried still because suppose instead of them just noticing that she, and remembering that she had a suspended license, suppose the initial officer, Myers, spots her blowing a stop sign. She just drives right through it. Well, that's obviously a traffic violation. So he follows her, he activates his lights, and everything else happens the way it happened. Even if Myers personally knows, or Richard joins the chase, that this five year old incident is there when she was tased, what do they do differently that they didn't do? Well, in this case, what transpired was that... I remember. I'm sorry? I remember what happened in this case. Okay, you walk up to her, you don't walk up to her and tackle her to the ground. When there's a dog right next to her, she said... But why does that have anything to do with the old incident? Seems to me that was ridiculous anyway. She barely gets out of the car, she stands there for not a second, and all of a sudden, boom, three men are hurling her to the ground. And she also told them that she's having back surgery. So this is something that should have been... I have 20 seconds left. This is something that should have been available for cross examination. Didn't you know? Did you have to go up and tackle her? And all that sort of stuff. The lady is, with all due respect, freaked out. And she has a right to be freaked out. She's a woman who was abused, however you wanna characterize, by an officer, and hurt, and his department said so. So she has a reason to be afraid. And the officer has a reason, and he said, a reasonable officer, his words were in the deposition, his words were, a reasonable officer would take this into consideration when interacting with her, period. So that is the Graham test. And he says it, he'd be like his own expert, it's an admission against him, this is part of his test. I just wanna state the reasons why it also is factually required. So the first is, she was in fear, and that the officer knew she was in fear, and should have been subject to cross examination for that. And he admitted, a reasonable officer should take it into consideration. Number three, there's no explanation why she drove home. It's a peculiar case, I'm sitting here arguing a case to the jury, it's in a vacuum, I cannot argue it, I can't explain things. Next, was she hiding something? I don't know. Was she a danger? Did officers have a right to believe she's a danger now, based upon these facts? Did she commit a crime? I can't talk about it, because I can't talk about why she ran. Or I'm sorry, in this instance, to be clear, she didn't... She traveled at a very slow speed. It's a very deliberate drive. Yeah, very slow speed, they said she committed no traffic violations, believe it or not, those were their words. She didn't, she stopped longer to stop sign than anybody I've ever seen. So those are the reasons why it's interlinked. Okay. Two things I wanna leave with is that he truly is, and I'm not just ranting as a lawyer, he's truly benefiting from committing a prior bad act. And the benefit is, if I do it, and the cops hear about this, oh well, look, I did this before, the judge may keep it out in the next case. And really, we need to think about that, because that's what happened in this case. Can't talk about it. And lastly, they benefited from that bad act, he benefited from it, because I couldn't talk about what transpired in the case. So he benefits, and so as a matter of policy, the officer shouldn't be able to benefit from committing this bad act before. Not that it's for propensity, but he shouldn't benefit. And now a trial is a big hole in plaintiff's case, and I can't talk about things or argue things. I guess I got 52 seconds left, so thank you. Okay, let's just save a little bit, yeah. Thank you. Mr. Reeses. Good morning, and may it please the court, Mike Reeses on behalf of the defendant of Pelley's. Let's start with some background on law. Mr. Reeses. Yes. Suppose Officer Rickard is walking behind a deaf person and yells at the deaf person to stop. But of course, the deaf person didn't hear him, and so the deaf person doesn't stop. After he yells a number of times, Officer Rickard then tackles the deaf person and handcuffs him. Suppose we find out later that Officer Rickard knew all along that the suspect was deaf. Would you argue that the jury in an excessive force case may not find out that Officer Rickard knew the suspect was deaf? That's a good question. So if I could answer that question, I think there would be a twofold analysis. First, it'd have to be under Rule 404B, and then if there was some propensity free inference that could be drawn, you would then see if it was relevant under Rule 403. Now, the point of the question, if I understand it, is that it's not 404B evidence here. Well, in that situation... It's just knowledge. That's just based on knowledge, and what I'm saying is that you wouldn't get to the second prong, because I guess it would be a permissible inference under 404B2, if we're talking about the officer's knowledge that the suspect was deaf. So in that situation, I think I'd agree with you that that would be admissible. And it's maybe... You jumped back to 404B, it's really just part of the story of what happened. He attacks the deaf person, or obviously, in our case, attacks Ms. Burton, knowing that this disability, if you will, is there. The deafness or the fear of the police because of the earlier grotesque overreaction to the boombox, or whatever it was, the sound amplification. It tells you why... Most people who are fleeing police officers don't use their turn signals, drive 20 miles an hour, and make sure that the police are able to follow them for... Couldn't be more than a minute and a half before she pulls into her driveway based on the dash cam. But she also took evasive action. No, she didn't. She was heading directly to her home. They may have thought it was evasive action, but she moves around so she can take the left. Well, from their perspective, which is the perspective that I think... They already know. They testify they think she's going home. Zion isn't that big. Excuse me. Officer Sergeant Arrington had pulled over, tried to stop in front of her, and she simply did a nice maneuver to her left. Which is where her house is. She doesn't drive 30 more seconds. She drives 10 more seconds and pulls into her driveway. But from their perspective, they see someone who is ignoring, refusing, deliberately refusing to stop... And driving 20 miles an hour while she does it with her turn signals. Okay, but she's still taking the evasive action, whether she's... I reject the evasive characterization. Counsel, let me ask you, when... In these sorts of excessive force cases, when officers know of a suspect's criminal history, the radio broadcast notes that the subject has a history of resisting arrest and is thought to be armed. That's all very relevant, right? Sure. That all comes in. Absolutely. Even if the information was wrong, right? If they're relying on it reasonably and objectively, certainly. And Richard's testimony, I understood from the deposition, was that he thought it would have been reasonable for the plaintiff to fear him. He also said that he didn't know what she was thinking. I know. And he... But I guess what I'm trying to understand is why it would be... There seems to be a little bit of asymmetry here, particularly given, since we know that bad information about the suspect comes in to help explain the officer's actions. But in this very unusual case, bad information about the officers doesn't come in to help explain the plaintiff's actions. Well, the law, I think, is pretty clear, and we cited Smith v. City of Chicago in our brief, to the effect that the plaintiff's state of mind, whether she was in fear or what she was thinking, is not relevant if you're looking at the... He doesn't need to know that. It's just that the evidence, when the jury is considering this, the jury's trying to figure out, was this an objectively reasonable set of actions for the police to take, for them to follow her home, for them, the second she kind of falls out of the van, to have three... On the driver's side, on the driver's side. I understand that. I watched the video this morning. Yes. But three large men pounce on her, throw her down to the ground. She's standing there for a half a second. Now, when we get this full story, why shouldn't the fact that there's this earlier incident suggest that she had perfectly good reasons for just getting to a safe place, her driveway, before she stops? And then you can see whether the force used under the circumstances was an objectively reasonable level of force. But with all due respect, the law in this circuit is very clear that her perspective and what she's thinking is not relevant. They know already... Well, I think I... And how would... And by the way, can I just ask, how would she have known that Officer Rickard was even involved in the pursuit? I think some of the questions... Oh, I'm not sure she would have, and I'm not sure it would have made any difference. I think if there'd been a stipulation that in 2008, she had been stopped by a particular officer, unnamed, of the Zion Police Department, and had been tased in conjunction with a sound amplification violation, that might have been enough to allow plaintiff to get her side of the story in. I'm not sure that it matters that Officer Rickard happened to be involved in this second one. Well, so... The other thing is, she maintains she did not know she was driving on a suspended license. She didn't know what they were coming after her for, according to her testimony. And Your Honor, if you look at Smith v. City of Chicago, the plaintiff said that he didn't know they were police officers, and he didn't think that he did anything wrong either. I mean... No, no, no. She knew they were police. I mean, this is quite different. I know that, but what I'm saying is that it seems as though we are shifting the perspective from what the officers could see and hear... No, we're not. Council, we're not making that shift, because this is a very unusual case in light of the evidence of Richard's actual knowledge of who they were pursuing, and his knowledge of that prior incident. Did either side... And this obviously was hotly contested in the district court. Did either side propose to the judge the kind of middle ground that Chief Judge Wood has suggested of a kind of slightly sanitized version of the 2008 incident, in which Richard's identity as the taser is not disclosed to the jury? I don't believe that there was any middle ground suggested. It was briefed through the motions to eliminate. The magistrate judge made her ruling in the order that disposed of the motions to eliminate. Plaintiffs came back twice on motions to reconsider, but there was no middle ground suggested. But we take actual knowledge of police officers into account all the time, and indeed have something called the collective knowledge doctrine. So if a police officer, for example, has actual knowledge that the person that he or she is pursuing is a well known drug dealer, we take that into account. If the police officer has actual knowledge that somebody typically is a gun runner, we take that into account. So I don't know why this actual knowledge is different from that actual knowledge. Well, normally you don't have one person testifying to another person's state of mind. No, that's not it. All she's saying is these officers had actual knowledge of the earlier incident. Going back to Judge Rovner's initial hypothetical. Well, the argument that the plaintiff makes... And the jury's not allowed to hear that. The argument that the plaintiff was making in his brief was that the plaintiff, that the officer knew or should have known that she was in fear. That's what the evidence that he was trying to get in and presumably would have been getting in through a back door. Why wouldn't that be a reasonable inference for an officer who sees this rather unusual response to signals to stop? I mean, it is an unusual response, right? It is, Your Honor. It's not a high speed flight. What on earth is going on here? This is Ms. Bergen. We have a history there. No, Your Honor, I will say this. If that video, if that dash cam was a movie, it wouldn't be the French Connection, the Chase and the French Connection or any Steve McQueen movie from the 60s. I get that there was something unusual about that. But again, from the officer's perspective, they're seeing someone who is not obeying their commands and is doing it for a fairly lengthy time because, yes, she was going at a slow... Not very long. I mean, I suppose that's relative. It's about four minutes. I think it came to about four minutes. Okay. Well, all right. You need to wrap up. The other part of this... You need to wrap up and then I'm going to give you your opponent. Yes. The other part of this, of course, is whether or not the error would have made a difference to the outcome. Well, okay. We understand that. We'll let you stand. And all I can say is, based on what the jury heard and saw on the video cam, they had enough evidence to side the case the way they did. Okay. Thank you very much, Mr. Reeses. Thank you. We ask you to... Mr. Horwitz, I will give you an extra minute for your rebuttal. I don't have much to add. I'm curious if you have any questions that I can answer. I do. It goes back to my question about whether either side suggested the middle ground. And the reason I'm raising that is because it seems to me the middle ground, as Chief Judge Wood suggested, is a theory that would not depend upon a propensity argument. And the failure to suggest that middle ground suggests to me that what this is really was about propensity. Well, first of all, what I would say to you is that I vociferously and aggressively tried to get this order changed. And that was my focus when the court would not allow the order, the introduction of this evidence, contrary to what she said in summary judgment, which isn't obviously, you know, it's not the law of the case. But my focus was on to reverse, not to enter a stipulation. I think, quite frankly, and I will say respectfully, I was pushing the envelope and I don't want to be disrespectful to the trial court, notwithstanding your suggestion. In other words, well, we could offer this as a stipulation. Normally, in my experience, the court will say, well, let's try to figure this out. Let's try to slice it up a bit. Let's try to make it so it's a little more innocuous and less painful, less prejudicial, things like that. And we create a stipulation. I did not proffer stipulation. Yeah, but I mean that, you know, the way this was presented, I'm just trying to think like a trial judge for a second. It's being presented as, you know, kind of like baseball style arbitration, all one side or the other. When there may, in fact, have been middle ground available, it would be hard for me to say the district judge abused her discretion by not taking a route that neither side proposed. Well, I didn't propose it because she repeatedly told me no. And I mean, I was there, as I am here with you now, looking at her and she was getting a bit perturbed with me for asking yet again because I tried two motions to reconsider and I'm on trial with a judge that I don't want to make angry. So I try to respect that. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.